Filed 6/10/22  P. v. Taylor CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRAMMEL VERNON TAYLOR,<br><br>Defendant and Appellant. | F082567<br><br>(Super. Ct. No. SC082158A)<br><br>**OPINION** |

### THE COURT*

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Levy, Acting P. J., Detjen, J. and Smith, J.

## INTRODUCTION

In 2001, a jury convicted petitioner Tramell Vernon Taylor of first degree murder (Pen. Code,[1] § 187, subd. (a), count 2).[2] As to the murder offense, the jury found true the special circumstance that petitioner committed the murder while engaged in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)). The trial court subsequently sentenced petitioner to a term of life without the possibility of parole. (*People v. Taylor et al.* (Oct. 14, 2003, F039096) [nonpub. opn.] (*Taylor*).)

In 2019, petitioner filed a petition for resentencing on his murder conviction pursuant to section 1170.95. The trial court summarily denied the petition without providing a statement of reasons as to why it did not issue an order to show cause.

On appeal, petitioner contends the trial court erred by engaging in premature judicial factfinding and applying a "sufficiency of the evidence" test at the prima facie stage. Petitioner further contends that he is not ineligible for resentencing as a matter of law because our Supreme Court's holdings in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) substantively changed the legal meaning of "major participant" and "reckless indifference to human life" and therefore the jury's special circumstance finding should not exclude him from resentencing relief. Lastly, petitioner contends the trial court's denial of the petition without issuing an order to show cause violated his procedural due process rights. We conclude any errors were harmless and affirm the trial court's order denying resentencing relief pursuant to section 1170.95.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Petitioner was convicted of additional offenses and enhancements, as described below.

2.

## FACTUAL AND PROCEDURAL BACKGROUND

We include a brief summary of the facts of this case taken from petitioner's direct appeal.[3]

> "Murder victim Darryl McCoy, Jr. (DJ) [fn. omitted] 'hung out' with defendant Richardson and knew [petitioner]. McCoy's mother, Shawna G[.],[4] used crack cocaine. From October to December of 2000 she sometimes purchased her drugs from Kendall M[.] (Pookie) at [a] [m]otel. [Shawna] also had a relationship with Calvin M[.] (Aces), a friend of [Kendall].

> "On the evening of December 5, 2000, Aaron G[.] (McCoy's uncle and Shawna's brother) was staying with Shawna in her home. McCoy, [petitioner] and Richardson arrived at Shawna's home at approximately 10 or 11 p.m. on the evening of December 5, 2000. On this night, Shawna heard McCoy talk with Richardson about robbing [Kendall] in his room at the [motel]. Richardson suggested that McCoy ask Shawna if [Kendall] and his friends had guns and/or money. Shawna told McCoy not to ask her anything.

> "McCoy, [petitioner] and Richardson conversed that evening with Aaron. They asked him what was happening on 'U Block' (Union Street) and inquired if there was any 'money rollin' through there.' Aaron told the three 'nobody got it going on down there.' [Petitioner] disagreed with Aaron's assessment of the situation and insisted that [Kendall] and others had a lot of money. [Petitioner] continued to encourage the group to go to the [Motel] to rob [Kendall] and others. Aaron insisted that the occupants of the motel did not have any money. McCoy, Richardson and [petitioner] agreed to a plan to go to the motel and rob [Kendall] and others. Aaron testified that Richardson always carried a gun with him and that [petitioner] was carrying a small gun with a clip the night of the murder. [Fn. omitted.]

> "McCoy, [petitioner] and Richardson left in a dark-colored Ford Blazer. [Petitioner] was driving.

---

[3]     We provide these facts from the direct appeal because they were cited by both parties in their opening briefs. However, we do not rely on these facts in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

[4]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

"In December of 2000, [Kendall] had been living in room 4 of the … motel for two or three months. His sister Crystal lived in room 3 with their mother, Darlene L[.]. Crystal's boyfriend was Brian C[.] (Rifle). Bobby S[.] (G Bob) lived in room 12.

"On the evening of December 5, 2000, [Kendall], Tyrone J[.] (Rone), and Shavon S[.] (V) were in room 4 drinking, smoking marijuana, and watching television. [Brian] was in and out of room 4 that evening.

"G Bob saw McCoy outside of G Bob's room before 1 a.m. on December 6, 2000. He was with two other individuals that G Bob did not know. McCoy was wearing a light-colored sweatshirt. The three individuals came into his room. G Bob asked McCoy if he would sell him some crack cocaine. McCoy said he was not there to sell crack. G Bob asked McCoy if he wanted to pay for a prostitute. McCoy replied no. The group was in his room for three to five minutes and then G Bob asked them to leave. G Bob left also.

"G Bob testified that he had seen a gun lying on a table in room 4 on more than one occasion. He was in room 4 hours before the shooting and he saw the gun in the room on a table. At trial, G Bob said he did not see [petitioner], Richardson, or McCoy with a gun. When G Bob was interviewed soon after the shooting, he told Detective Adair that one of the three men pulled out a gun as the men walked toward room 4. G Bob identified Richardson as the individual with the gun. At trial, he testified that he never saw anyone pull out a gun.

"At the time when McCoy was visiting with G Bob, Calvin [] (Ace) arrived at the. . . Motel to pick up [Kendall]. He noticed three or four men wearing dark clothing by room 12. He got 'bad vibes' from them and thought they looked like they were getting 'geared up' for something. [Calvin] knocked on the door of room 4. [Kendall] answered the door, and [Calvin] told him to grab his stuff so they could get out of there because there were men nearby who looked suspicious. [Calvin] headed towards his car to wait for [Kendall]. [Kendall] shut the door and stayed in the room to gather up some of his things. Someone called the room and told [Kendall] that some suspicious men in the parking lot were going to do something.

"McDaniel opened the door and saw 'the silver guns' and then he saw 'gun flashes.' McDaniel tried to close the door. He ran to the bathroom. He heard 12 or 13 more shots and then left through the bathroom window. McDaniel told officers that the person who shot him wore a ski mask or a hood.

4.

"V testified that 10 minutes after someone came to their door and warned them that there were suspicious people outside, someone came in the room shooting. V was on the bed half asleep when the shooting started; he fell to the side of the bed. One person came into the room shooting and another person started shooting from outside of the room. After a few minutes the shooting stopped and V went out the bathroom window.

"When interviewed by Detective Adair, V stated that after they had been warned that something was going to occur he looked out of the room. He saw G Bob and three others approach the room. G Bob continued walking away from the room but the other three stopped. Two of the males were wearing dark clothing and a third was wearing light-colored clothing. He said that one in dark clothing entered the room shooting and another in dark clothing stayed in the area of the open door and was shooting into the room. He did not see the person in the light-colored clothing in the room or shooting.

"James testified that he was asleep before the shooting. He dropped to the floor and stayed there until the shooting stopped. He then left out the bathroom window. Because he was on the floor he did not see anything.

"McDaniel, V, and James all testified that they did not have a gun in the room and they were not selling drugs from the room. They denied being members of the Country Boy Crips.

"[Brian] testified that he was in room 3 with McDaniel's sister when he heard gunshots. He did not look out the window and did not see anyone. He got down on the floor beside the bed and eventually jumped out the bathroom window. When interviewed after the shooting, [Brian] said he heard gunfire and looked out the window. He said he saw someone outside his window in room 3 wearing a light-colored sweatshirt, leaning forward and twisting and shooting a handgun into room 4. It looked like this person got shot and fell to the ground.

"Warren M[.] was living at the . . . motel in room 15. He heard shots in the early morning hours of December 6, 2000. He called 911 but did not look out his window. When he did look out his window, he saw two people picking up a body and putting it into a dark-colored sports utility vehicle.

"Police officers arrived at the … motel. McDaniel had been shot. He was transported to the hospital. McDaniel had a gunshot wound to his upper abdomen. The entry wound was underneath the ribs; the bullet was lodged in the back of his body, just behind his armpit. McDaniel also had a

5.

penetrating gunshot wound in his right upper arm and left forearm. Bullets were not recovered from these wounds.

"Police officer Bobby Ray Woolard arrived at the … [m]otel. He secured room 4 and then waited outside. He heard a noise inside the room. He reentered the room and found V and James had entered the room from the bathroom window. They were placed into handcuffs and seated in patrol cars.

"The police radios were on in the car. Information came over the radio indicating that [petitioner] may have been involved in the incident. V said, '[petitioner] definitely shot Pookie.' Officer Woolard saw what looked like drugs in front of room 4.

"On December 6, 2000, Raynisha F[.], the mother of [petitioner]'s child, was at the home of her mother, Latonia W[.]. Her sister Kandis N[.] was at the home also. [Kandis] heard a car coming quickly up the street. She heard the car brake and the car doors open. The front door to the house opened and [petitioner] ran inside. He said his friend had been shot. [Latonia] called 911. [Kandis] called an ambulance and went outside, as did [Raynisha] and [Latonia]. [Petitioner] and Richardson took McCoy out of the Blazer and put him on the grass. [Kandis] took McCoy's shirt off and tried to stop the bleeding. [Petitioner] was standing over [Kandis]; shortly thereafter [petitioner] departed.

"Police arrived at [Latonia]'s home. An officer asked Richardson for his driver's license. He complied. The officer inquired who had been driving the Blazer. Richardson said [petitioner]. The officer asked Richardson for the room number of where this incident took place. Richardson commented they were just visiting friends. The officer told Richardson he knew this incident happened at the [motel] and asked him for the number of the room where the incident occurred. Richardson admitted the incident happened near room 4. The officer went inside looking for [petitioner] but could not find him. When the officer returned outside, Richardson was no longer at the scene.

"McCoy was transported to the hospital. He died from a single gunshot wound through his heart. The path of the bullet was sharply downward and front to back. It was the pathologist's opinion that McCoy was crouched or in a stooped position when he was shot. McCoy would have been incapacitated in a matter of seconds after being shot. A bullet was retrieved from McCoy's body.

6.

"Officer Jeff Cecil seized items from the lawn on Fifth Street. Included in the items were a white tee shirt and a gray fitted sweatshirt. These items had blood on them. There were no bullets or guns in the Blazer on Fifth Street.

"A bullet was retrieved from McDaniel during surgery. Numerous nine-millimeter Markahov casings were found in room 4. An expert determined that the bullet from McDaniel and the casings found scattered about in room 4 were fired from the same weapon. Two .38-caliber spent bullets were found in room 4. The bullet recovered from the deceased victim, McCoy, was either a .38-caliber or a nine-millimeter. Based on markings on the bullets and casings, the expert determined that the bullet from McCoy's body could not have been fired from the same gun that fired the bullet retrieved from McDaniel or the .38-caliber spent bullets found in room 4. At least three guns were fired during the shooting. In addition, two live .45-caliber shells were located in the parking lot, suggesting the presence of a fourth gun. Also, there were numerous holes in the walls and windows of room 4. Because of the location of the holes, the police did not attempt to recover spent bullets from these areas.

"Frank Gonzales, a police officer in the gang suppression unit, testified that [Brian], V, and James were active members in the Country Boy Crips. McDaniel was not a full-fledged Country Boy Crip but was an affiliate. [Petitioner], Richardson, and McCoy were members of the West Side Crips. The West Side Crips and the Country Boy Crips were deadly rivals. It was his opinion that the crimes that occurred on December 6, 2000, were gang related and performed with the intent of benefiting the gang.

**Defense**

"Witnesses testified regarding the whereabouts of [petitioner] and Richardson on December 5, 2000. [Fn. omitted.] Richardson testified on his own behalf. He claimed his group went to the motel because McCoy wanted to visit G Bob. As they were leaving, shots rang out from room 4. Richardson and [petitioner] picked up McCoy, put him in the Blazer, and drove to Fifth Street. Richardson was so shaken up by the incident that he left after giving the police officer his identification. He claimed that he did not have a gun, nor did [petitioner] or McCoy. A private investigator testified that it was his opinion that Richardson was not a gang member." (*Taylor*, *supra*, F039096.)

7.

On March 12, 2001, the Kern County District Attorney filed an information charging petitioner with the first degree murder of McCoy (§ 187, subd. (a), count 2) with the special circumstance that the murder was committed during the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)) and conspiracy to commit both robbery and murder (§§ 182, subd. (a)(1), 212.5, subd. (c), 187, subd. (a), count 1) with specific overt acts,[5] along with a gang enhancement (§ 186.22, subd. (b)(1)), out of custody enhancement (§ 12022.1), and a firearm enhancement (§ 12022.53, subd. (d)). As to a prior November 26, 2000 incident, the information also alleged the offenses of robbery (§ 212.5, subd. (c), count 3 (Herman J.)), with a gang enhancement (§ 186.22, subd. (b)(1)) and a firearm enhancement (§ 12022.53, subd. (d)); robbery (§ 212.5, subd. (c), count 4 (Pamela W.)), with a gang enhancement (§ 186.22, subd. (b)(1)) and two firearm enhancements (§ 12022.53, subds. (b), (d)); assault with a firearm (§ 245, subd. (a)(2), count 5 (Sabrina B.)), with a gang enhancement (§ 186.22, subd. (b)(1)) and a firearm enhancement (§ 12022.5, subd. (a)(1)); assault with a firearm (§ 245, subd. (a)(2), count 6 (Herman J.)), with a gang enhancement (§ 186.22, subd. (b)(1)), a

---

**5**     The overt acts alleged in the information were as follows:  (1) on December 5, 2000, West Side Crip coconspirators petitioner and Dewayne Richardson went to the motel to locate rival Country Boy Crip gang members; (2) West Side Crip coconspirators petitioner, Dewayne Richardson, and Darryl McCoy went back to the motel on December 6, 2000 to attack the occupants of room number 4; (3) the three West Side Crip coconspirators obtained masks to use in the attack; (4) one of the coconspirators said "what's up cuzz" to Brian C. before the attack; (5) when the door to room number 4 opened, one of the Westside Crip coconspirators shot Kendall McDaniel; (6) one of the Westside Crip coconspirators went into the room and shot several times at the occupants; (7) petitioner and Dewayne Richardson gathered up their fallen Westside Crip coconspirator and loaded him into a S-10 Blazer; (8) petitioner and Dewayne Richardson dumped their fallen Westside Crip coconspirator in the front yard of a house in Westside Crip territory; (9) petitioner fled from the house at about the time officers were arriving; and (10) Westside Crip coconspirator Dewayne Richardson fled after talking to officer Dickson.

firearm enhancement (§ 12022.5, subd. (a)(1)) and a great bodily injury enhancement (§ 12022.7).[6]

On June 27, 2001, a jury convicted petitioner of first degree murder (§ 187, subd. (a), count 2) and found true the robbery special circumstance (§ 190.2, subd. (a)(17)(A)).  The jury also convicted petitioner of conspiracy to commit robbery and murder (§§ 182, subd. (a)(1), 212.5, subd. (c), 187, subd. (a), count 1) and found true overt acts 3, 5, 6, 7, 8, 9, and 10, along with finding true the gang (§ 186.22, subd. (b)(1)) and firearm (§ 12022.53, subd. (d)) enhancements.[7]  On September 25, 2001, as to count 2, the trial court sentenced petitioner to a term of life without the possibility of parole.  As to count 1, the trial court sentenced petitioner to the upper term of five years, plus an additional five years for the gang enhancement (§ 186.22, subd. (b)(1)) and an additional two years for the out of custody enhancement (§ 12022.1) to run concurrent with count 2.[8]

On appeal, this court ordered the abstract of judgment corrected to delete the imposition of the $200 restitution fine imposed pursuant to section 1202.45, but in all other respects affirmed the judgment.  (*Taylor*, *supra*, F039096.)

On July 12, 2019, petitioner, in propria persona, filed a petition for resentencing on his murder conviction pursuant to section 1170.95.  In the petition, petitioner stated he "was tried and convicted under a theory of natural and probable consequences or felony-murder and he was not found to [] be the principal.  Therefore, [his] conviction for [m]urder is improper under [Senate Bill No.] 1437 and should be vacated and [p]etitioner

---

[6]     Counts 3 through 6 were subsequently bifurcated in a separate jury trial. Therefore, for purposes of this appeal, only counts 1 and 2 are relevant.

[7]     As to the out of custody enhancement (§ 12022.1), the trial court took judicial notice of case No. BF093169 with the complaint filed on October 13, 2000.  The trial court subsequently found true the out of custody enhancement (§ 12022.1).

[8]     At sentencing, the trial court struck the firearm enhancement (§ 12022.53, subd. (d)).

9.

should be resentenced accordingly." Petitioner further stated he "was tried for first-degree murder … [and] [t]he jury instructions included a 'natural and probable consequences' theory of aiding-abetting liability." Petitioner further stated, "the jury agreed that the natural and probable consequences theory justified conviction for first degree murder in the absence of finding that [p]etitioner was guilty of felony-murder or provocative act murder" and that "there was no evidence to support allegations of premeditation in regards to committing murder." Lastly, petitioner requested the appointment of counsel.

On August 6, 2019, the People filed a motion to dismiss arguing Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) is unconstitutional. On January 28, 2020, the People filed a further opposition to the petition for resentencing pursuant to section 1170.95 arguing the jury's true finding on the robbery special circumstance established that petitioner was acting as a major participant in the felony with reckless indifference to human life and therefore is ineligible for relief. On June 11, 2020, the People filed a supplemental opposition arguing petitioner was convicted of a provocative act murder and therefore fell outside the scope of section 1170.95. On March 2, 2021, petitioner, through his counsel, filed a reply to the People's opposition to resentencing relief arguing that petitioner had made a prima facie showing of entitlement to resentencing relief.

On March 24, 2021, the trial court summarily denied the petition without providing a statement of reasons for why it decided not to issue an order to show cause.

A timely appeal followed.

**DISCUSSION**

I.      **Applicable Law**

Effective January 1, 2019, the Legislature passed Senate Bill 1437 "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that

10.

murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[9] (§ 189, subd. (e); accord, *Gentile*, *supra*, 10 Cal.5th at p. 842.)

Finally, the bill added section 1170.95 to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, at p. 843.) This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter." (§ 1170.95, subd. (a).)

"Section 1170.95 lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing."

---

[9] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

(*Gentile*, *supra*, 10 Cal.5th at p. 853.)  First, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]

> "(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]

> "(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1170.95, subd. (a)(1)–(3); see also § 1170.95, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel."  (§ 1170.95, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition.  (§ 1170.95, subd. (b)(2).)  Otherwise, counsel must be appointed, if requested.  (§ 1170.95, subd. (b)(3).)  The prosecutor must file a response and the petitioner may file a reply.  The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961–963, 967.)  In making this determination, the court may rely on the record of conviction.  (*Lewis*, at pp. 970–971.)  The record of conviction includes, but is not limited to, jury instructions and verdict forms.  (See generally *id*. at p. 972.)  However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' "  (*Id*. at pp. 971–972.)

12.

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1170.95, subds. (c), (d)(1).)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.     Analysis

### A.     Judicial Factfinding at the Prima Facie Stage

Petitioner contends the trial court denied the petition based on premature judicial factfinding at the prima facie stage. Because the trial court denied the petition without issuing a statement of reasons, it is unclear what materials the trial court relied on and what conclusions it drew in determining petitioner is ineligible for resentencing. To the extent the trial court engaged in judicial factfinding at the prima facie review, the court erred. (*Lewis*, *supra*, 11 Cal.5th at p. 972).

### B.     "Sufficiency of the Evidence" Test

Petitioner also contends the trial court improperly applied a "sufficiency of the evidence" standard in finding him ineligible for section 1170.95 resentencing relief. First, as noted above, this court is unable to ascertain what materials the trial court relied on and what conclusions it drew in determining petitioner is ineligible for resentencing. Therefore, it is unclear what standard the trial court applied in finding petitioner ineligible for relief.

13.

Second, petitioner cites a previous split of authority in the Courts of Appeal as to the prosecution's burden of proof at the section 1170.95, subdivision (d) evidentiary hearing. (See *People v. Duke* (Sept. 8, 2020) B300430, opn. ordered nonpub. Nov. 23, 2021, S265309 ["To carry its burden, the prosecution must … prove beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder. This is essentially identical to the standard of substantial evidence .…"]; but see *People v. Lopez* (Oct. 30, 2020) H047254, opn. ordered nonpub. Dec. 22, 2021, S265974 ["[W]e hold that to establish a petitioner's ineligibility for section 1170.95 relief … the prosecutor must prove beyond a reasonable doubt the elements of first or second degree murder under the current law"].) However, both *Duke* and *Lopez*, decided prior to the codification of Senate Bill No. 775 (2021–2022 Reg. Sess.), analyzed the prosecution's burden of proof at the section 1170.95, subdivision (d) evidentiary hearing, *not* the initial prima facie hearing. (See Sen. Bill No. 775 (2021–2022 Reg. Sess.); Stats. 2021, ch. 551, §§ 1, subd. (c), 2, subd. (d)(3); § 1170.95, subd. (d)(3) [the prosecution's burden of proof at the section 1170.95, subdivision (d) evidentiary hearing is proof beyond a reasonable doubt].) The instant case was disposed of at the prima facie hearing. The trial court, at the prima facie stage, considers whether a petitioner is ineligible for resentencing relief *as a matter of law*. (See *Lewis*, *supra*, 11 Cal.5th at p. 966.)

Again, we are unable to discern the standard the trial court applied in finding petitioner ineligible for resentencing relief. However, to the extent the trial court applied a "sufficiency of the evidence" test at the prima facie stage, the trial court erred. (*Lewis*, *supra*, 11 Cal.5th at p. 972).

## C.     Any Errors Were Harmless Because Petitioner Is Ineligible for Resentencing as a Matter of Law

To be eligible for relief pursuant to section 1170.95, petitioner must not have been the actual killer, must not have acted with the intent to kill or malice aforethought, and must not have been a major participant in the underlying felony who acted with reckless indifference to human life.  (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.)  Here, as to the murder charge, the jury found true the robbery special circumstance (§ 190.2, subd. (a)(17)(A)).  This special circumstance applies when a defendant acted "with reckless indifference to human life and as a major participant" in aiding and abetting the commission of an enumerated felony.  (§ 190.2, subd. (d); *People v. Gutierrrez-Salazar* (2019) 38 Cal.App.5th 411, 419.)  In other words, "[t]he language of the special circumstance tracks the language of Senate Bill 1437 and the new felony-murder statutes."  (*Ibid*.)  The jury found true that petitioner acted "with reckless indifference to human life and as a major participant" in aiding and abetting the commission of an enumerated felony.  Therefore, the special circumstance finding establishes he could still be convicted of first degree murder under the law, as amended by Senate Bill 1437.  Petitioner is unable to establish the errors prejudiced his case because he is ineligible for resentencing relief as a matter of law.

Nonetheless, petitioner contends our Supreme Court's holdings in *Banks*, *supra*, 61 Cal.4th at p. 788 and *Clark*, *supra*, 63 Cal.4th at p. 522 substantively changed the legal meaning of "major participant" and "reckless indifference to human life" and therefore the prior special circumstance finding should not exclude him from resentencing relief.  We disagree.  "*Banks* and *Clark* 'clarified "what it means for an aiding and abetting defendant to be a 'major participant' in a crime who acted with a 'reckless indifference to human life.' " ' [Citation.]  *Banks* identified certain factors to consider in determining whether a defendant was a major participant; *Clark* identified factors to guide the determination of whether the defendant acted with reckless

15.

indifference to human life." (*People v. Gomez* (2020) 52 Cal.App.5th 1, 13, fn. 5, review granted Oct. 14, 2020, S264033.) Courts of Appeal are split on the question of whether a special circumstance finding, or admission, entered prior to *Banks* and *Clark* renders a petitioner ineligible for section 1170.95 resentencing relief as a matter of law (see *People v. Jones* (2020) 56 Cal.App.5th 474, 478–479 [collecting cases], review granted Jan. 27, 2021, S265854), and our Supreme Court has granted review to decide the issue (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606).

This court has concluded that a special circumstance finding entered prior to *Banks* and *Clark* precludes relief as a matter of law. (*People v. Simmons* (2021) 65 Cal.App.5th 739, 748–749, review granted Sept. 1, 2021, S270048.) In so doing, we held that *Banks* and *Clark* did not state a new rule of law but rather illuminated factors a fact finder might consider in determining whether a defendant was a major contributor who acted with reckless indifference to human life. (*Ibid.*) Although we recognize review has been granted in *Simmons*, we see no reason to depart from our analysis and conclusions therein. The principles illuminated in *Banks* and *Clark* existed when the jury found true the robbery special circumstance (§ 190.2, subd. (a)(17)(A)) and we have no basis to conclude the jury or the court understood these terms differently at the time of his conviction. Accordingly, petitioner is unable to establish a prima facie showing he is entitled to resentencing relief because he is ineligible for resentencing relief as a matter of law.

Nonetheless, petitioner argues the jury could have convicted him of first degree murder under either a felony-murder or natural and probable consequences theory eliminated by Senate Bill 1437 and argues the trial court did not instruct the jury it was required to "unanimously agree on any one or more theories of guilt for the first-degree murder verdict." Petitioner suggests some or all of the jurors may have found him guilty under a now-invalid theory of murder. The special circumstance finding, however,

16.

establishes the jury unanimously agreed that petitioner was a major participant who acted with reckless indifference to human life rendering petitioner liable for murder under current law.

### D. No Violation of Procedural Due Process

Finally, we reject petitioner's assertion the denial of his petition without issuance of an order to show cause violated his constitutional rights to due process. Due process is implicated when the state attempts to deprive a defendant of some liberty interest. (*Hewitt v. Helms* (1983) 459 U.S. 460, 466, abrogated on another point by *Sandin v. Conner* (1995) 515 U.S. 472, 483, fn. 5.) As stated above, petitioner is "categorically ineligible for relief under section 1170.95." (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 908, abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at pp. 962–963.) Therefore, petitioner has no liberty interest in any of the procedures afforded by section 1170.95, subdivision (d). (See *Tarkington*, at p. 908.)

## DISPOSITION

The order denying petitioner's section 1170.95 petition is affirmed.